# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM F. OSBORNE, | ) | CASE NO. 1:15CV2233 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, William F. Osborne ("Plaintiff" or "Osborne"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In March 2008, Osborne filed applications for POD, DIB, and SSI**,** alleging a disability

onset date of April 30, 2003 and claiming he was disabled due to grand mal seizures, liver and

pancreas damage, epilepsy, lower back pain, depression, anxiety, and short term memory loss. (Transcript ("Tr.") 130.)  The applications were denied initially and upon reconsideration, and Osborne requested a hearing before an administrative law judge ("ALJ").  (Tr. 70-76, 78-83, 87-88.)

On September 28, 2010, an ALJ held a hearing, during which Osborne, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 30-65.)  On October 13, 2010, the ALJ issued a written decision finding Osborne was not disabled.  (Tr. 14-29.)  The ALJ's decision became final on May 25, 2012, when the Appeals Council declined further review.  (Tr. 1-3.)

Osborne appealed the decision to this Court in July 2012.  *See Osborne v. Comm'r of Soc. Sec.*, Case No. 1:12cv1904 (N.D. Ohio) (Burke, M.J.)  On September 17, 2013, Magistrate Judge Kathleen Burke issued a Memorandum Opinion & Order reversing the October 2010 ALJ decision and remanding for further proceedings consistent with her Opinion.  (*Id*. at Doc. No. 18.)  Of particular relevance herein, Judge Burke ordered as follows:

> Without more explanation in the ALJ's decision, it is unclear how a limitation of occasional supervision fairly described Osborne's limitations in concentration, persistence *and* pace. Thus, on remand, the ALJ should provide further explanation as to how he accounted in the RFC for his findings of moderate limitations in concentration, persistence *and* pace, or alternatively, explain why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary.

(*Id.* at Doc. No. 18, p. 25)(emphasis in original).

Meanwhile, on March 28, 2011, Osborne filed a subsequent application for SSI, alleging disability beginning October 14, 2010.  (Tr. 567.)  The application was denied initially and upon reconsideration.  (*Id.*)  On October 23, 2012, an ALJ held a hearing, during which Osborne,

2

represented by counsel, and an impartial VE testified.  (*Id.*)  On January 4, 2013, the ALJ issued a fully favorable written decision finding Osborne was disabled as of March 28, 2011, the date his SSI application was filed.  (Tr. 567-576.)

In an Order dated January 23, 2014, the Appeals Council affirmed the ALJ's favorable decision but determined the period prior to March 28, 2011 required further administrative proceedings.  (Tr. 492, 605.)  Therefore, the Appeals Council vacated the October 2010 ALJ decision and remanded it for further proceedings consistent with Magistrate Judge Burke's Opinion & Order.  (Tr. 492, 605.)  The Appeals Council further noted that "[i]n compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision on the issue of disability before March 28, 2011."  (Tr. 606.)

On July 23, 2014, an ALJ held a hearing, during which Osborne, represented by counsel, and an impartial VE testified.  (Tr. 511-543.)  Thereafter, on September 26, 2014, the ALJ issued a written decision finding Osborne was not disabled from April 2003 through March 27, 2011. (Tr. 492-502.)  The ALJ's decision became final on September 4, 2015, when the Appeals Council declined further review.  (Tr. 481-484.)

On October 30, 2015, Osborne filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.)  Osborne asserts the following assignments of error:

> (1)  An ALJ may not deviate from a Court remand order. The remand ordered the ALJ to provide "further explanation as to how he accounted in the RFC for his findings of moderate limitation in concentration, persistence and pace, or alternatively, explain why additional restrictions beyond simple, routine, repetitive tasks and occasional supervision were not necessary."  The ALJ did not explain and instead changed the RFC.  This

3

was error.

(2)     Treating psychiatrist Dr. Ahn reported in August 2010 that Mr. Osborne was "markedly limited" in interacting appropriately with others, performing work activities at a reasonable pace, keeping a regular work schedule, and maintaining attention and concentration for two-hour periods.  The ALJ rejected those limitations.  The ALJ erred by making contradictory findings that Dr. Ahn was the "treating psychiatrist" but had not "established a relationship," by not applying the agency's definition of "treating source," by not giving appropriate deference to Dr. Ahn's opinions, and by not giving "good reasons" for discounting them.

(3)     Dr. Koricke, the agency's consulting examiner, reported that "It is highly probable that the stresses and pressures of daily work would exacerbate the acuity of his symptoms, worsening his moderate symptoms to a more severe major depression."  Dr. Zeck, another CE, reported that Plaintiff's limitation on relating to fellow workers and supervisors was moderate, but "on a continual basis he may have difficulty."  The ALJ's decision erred by failing to mention or weigh these related opinions.

(4)     The ALJ's findings of Plaintiff's higher functional capacity and non-disability through March 27, 2011, are inconsistent with a final prior ALJ finding of a lower functional capacity and disability beginning the next day, March 28, with no evidence of worsened condition. The decision did not justify its inconsistency. Relatedly, the decision improperly ignored Dr. Ahn's March 28, 2011, report as not relating to the period before the day of the report.

(Doc. No. 13.)

## II.     EVIDENCE

### A.      Personal and Vocational Evidence

Osborne was born in April 1969 and was forty-five (45) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 501.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has a limited education and is able to communicate in English.  (*Id.*)  He has past relevant work as a machinist.  (*Id.*)

4

**B.      Relevant Medical Evidence[1]**

The medical evidence through the date of the October 2010 ALJ decision is thoroughly and accurately set forth in Section II.B.1 of the Memorandum Opinion & Order issued by Magistrate Judge Kathleen Burke in *Osborne v. Comm'r of Soc. Sec.*, Case No. 1:12cv1904, 2013 WL 5221107 (N.D. Ohio Sept. 17, 2013).  As set forth in that Opinion, the relevant medical evidence in this matter through October 2010 is as follows:[2]

### 1. Treating medical providers

### Nord Center Treatment

On August 25, 2009, upon referral by his neurologist, Osborne sought treatment at the Nord Center for his anxiety and depression.  Tr. 430.  In the initial assessment, diagnoses included posttraumatic stress disorder and depressive disorder, not otherwise specified, with a GAF score of 60.  Tr. 439. No psychiatric evaluation was recommended.  Tr. 438, 448. Follow up sessions were scheduled (Tr. 448) but Osborne missed a number of those sessions.  Tr. 444–47.

### Thomas A. Williams, MA, LPCC

On March 15, 2010, Osborne met with Thomas A. Williams, a licensed professional clinical counselor, who was associated with psychiatrist Byong J. Ahn's office, and Mr. Williams completed a Clinician Interview/Treatment Plan. Tr. 478–80.  Osborne's chief complaint was that he had been dealing with a long history of anxiety problems.  Tr. 478.  He was sad and tearful and was unable to focus.  Tr. 478.  He stated that he tended to isolate himself and lacked patience to deal with other people.  Tr. 478.  He also indicated that he struggled with focusing and paying attention and his memory was impaired.  Tr. 478.  In the mental status examination portion of Mr. William's evaluation, Mr. Williams indicated that Osborne's mood was depressed and Osborne was anxious.  Tr. 480.  Osborne's recent and remote memory was intact.  Tr. 480.  Mr. Williams

---

[1]  As the parties focus their arguments on Osborne's mental impairments, the Court will confine its discussion of the medical evidence to those impairments.

[2]  The transcript citations in Magistrate Judge Burke's opinion also correspond to the transcript references in the instant case.

noted that Osborne's thought process was logical but it was pressured.  Tr. 480.
Osborne's speech was also pressured.  Tr. 480.  Osborne's insight and judgment
were fair.  Tr. 480.  Mr. Williams assessed Osborne as a low risk; Osborne did
not report any plans to hurt himself.  Tr. 480.  Mr. Williams indicated that
Osborne's strength was his willingness to get help for his problems whereas his
weakness was his poor self-esteem and self-confidence.  Tr. 480.

Osborne continued to see Mr. Williams and, on April 12, 2010, Osborne
indicated that things were "about status quo."  Tr. 477.  On May 24, 2010,
Osborne indicated that he had taken Mr. Williams' advice and tried exercising
as a way to alleviate some of his stress and anxiety.  Tr. 476.  Although
exercising had relieved some of his anxiety, Osborne reported that he was still
dealing with some anxiety and was not sleeping well.  Tr. 476.  At the May 24,
2010, visit, Mr. Williams indicated that he would schedule Osborne to see Dr.
Ahn.  Tr. 476.  On June 7, 2010, Osborne reported that he was doing better with
his mood and his anxiety levels were down.  Tr. 474.  Osborne was continuing
to exercise to relieve his stress but was still dealing with the loss of his wife.
Tr. 474.  Mr. Williams suggested that Osborne consider joining a bereavement
group and provided him with contact numbers to call.  Tr. 474.  Beginning on
June 25, 2010, Osborne started to see Dr. Ahn and also continued to see Mr.
Williams through at least August 30, 2010.  Tr. 470–73.  On August 16, 2010,
Mr. Williams noted that Osborne had had a good couple of weeks.  Tr. 471.
Osborne had traveled to West Virginia to spend a week at his girlfriend's
family's house.  Tr. 471.  During his August 30, 2010, visit with Mr. Williams,
Osborne indicated that his mother was still able to "push his buttons" and
"exacerbate his depression and anxiety."  Tr. 470.

Mr. Williams discussed stress management techniques with Osborne
and, because Osborne reported getting irritated when he went to his mother's to
retrieve his mail, he suggested that Osborne get a P.O. Box.  Tr. 470.  Osborne
indicated that he was leaving the house infrequently because he was too nervous
to go out.  Tr. 470.

### Byong J. Ahn, M.D., Psychiatrist

Following Mr. Williams' referral, on June 25, 2010, psychiatrist Byong
J. Ahn saw Osborne and conducted a psychiatric evaluation.[3]  Tr. 466–68.  Dr.

---

[3] This Court notes that, on April 12, 2010, Dr Ahn completed a Mental Functional
Capacity Assessment. (Tr. 670-671.)  He found Osborne was markedly limited in eight
categories, including the ability to understand, remember, and carry out detailed
instructions, the ability to maintain attention and concentration for extended periods, the
ability to work in proximity to others without being distracted by them, the ability to

6

Ahn reported that Osborne:

> Looked tense and nervous with tendency to show some
> pressured speech. He denied having suicidal thoughts or
> having thoughts of death wish at this time. Speech was
> generally coherent. No hallucinations or well-organized
> delusions, but a bit of low self-esteem with feeling nervous,
> tense, as well as anxiety-like symptoms. He claims he feels
> panic, but it does not appear to be panic. No impaired
> cognitive function at this time. His affect was a little tense
> and nervous.

Tr. 467.  Dr. Ahn's June 25, 2010, evaluation contained three "Impressions:" (1)
Generalized Anxiety Disorder; (2) R/O Panic Disorder; and (3) Major
Depression, R/O Bipolar Affective Disorder. Tr. 467. Dr. Ahn recommended
that Osborne take prescription medications.  Tr. 468.

On July 19, 2010, Osborne followed up with Dr. Ahn.  Tr. 465.  During
that visit, Osborne reported that he had purchased the recommended
prescription medications but he had not taken them because he was concerned
about the side effects.  Tr. 465.  Dr. Ahn prescribed a new medication, Lexapro,
he recommended that Osborne also take Xanax, and he advised Osborne to
follow up in one month.  Tr. 465.  On August 16, 2010, Osborne followed up
with Dr. Ahn and Osborne reported that he noticed some improvement in his
anxiety and he was able to sleep better.  Tr. 464.  Dr. Ahn advised Osborne to
take Xanax three times each day rather than twice each day and he advised
Osborne to continue to take Lexapro.  Tr. 464.

Four days later, on August 20, 2010, Dr. Ahn completed a Medical
Source Statement Concerning the Nature and Severity of an Individual's Mental
Impairment.  Tr. 459–60.  Dr. Ahn opined that Osborne had marked limitations
in a number of different work-related abilities, including his ability to: (1)
maintain attention and concentration for two-hour periods; (2) perform work
activities at a reasonable pace; (3) keep a regular work schedule and maintain
punctual attendance; (4) interact appropriately with others, e.g., public,
supervisors, co-workers; and (5) make judgments commensurate with the
functions of unskilled work, i.e., make simple work-related decisions.  Tr.

---

interact appropriately with the general public, the ability to get along with coworkers or
peers without distracting them or exhibiting behavioral extremes, and the ability to
respond appropriately to changes in the work setting.  (*Id.*)  Dr. Ahn further found
Osborne was moderately limited in eleven other categories, but not significantly limited
in his ability to carry out very short and simple instructions.  (*Id.*)

459–60.  Dr. Ahn stated that Osborne had the ability and capability to do unskilled/skilled jobs, but his psychological disorders prohibited adequate functioning at that time and Dr. Ahn noted that Osborne had had that problem for several years.  Tr. 460.  Dr. Ahn also stated that Osborne's memory was impaired due to his preoccupation; Osborne was constantly making lists and notes to remember what he was supposed to do.  Tr. 460.  Dr. Ahn assessed Osborne with a GAF score of 45 and noted that his highest GAF in the prior year was a 60.  Tr. 460.

*Osborne*, 2013 WL 5221107 at * 2-4 (footnotes omitted).

The record contains the following medical evidence regarding Osborne's mental impairments for the time period October 2010 through March 2011.  On October 11, 2010, Osborne returned to Dr. Ahn, reporting he was "doing okay" since increasing his Xanax from two to three times per day.  (Tr. 703.)  Dr. Ahn noted Osborne's "mood was okay and his anxiety is improved, but he still has some remnants of his anxiety."  (*Id.*)  Dr. Ahn continued Osborne on the same medication regimen.  (*Id.*)

Osborne next presented to Dr. Ahn on January 7, 2011.  (Tr. 702.)  He reported doing "all right except he state[d] he had a rough holiday season" due to family tensions.  (*Id.*)  Although he experienced increased anxiety and depression during the holidays, Osborne was "feeling better now that it is over."  (*Id.*)  Dr. Ahn found Osborne's medication was working "okay" for him, but he "still has some anxiety symptoms and panic-like symptoms."  (*Id.*)  He continued Osborne on the same medications.

On February 28, 2011, Osborne complained of nightmares and anxiety.  (Tr. 701.)  Dr. Ahn noted Osborne had called the week before due to increased nightmares and had been prescribed Klonopin.  (*Id.*)  Osborne also reported he went for a stress test due to chest pains and "they believe that this could have been caused by his anxiety."  (*Id.*)

Osborne presented again to Dr. Ahn on March 28, 2011, and reported Klonopin had

8

reduced his nightmares.  (Tr. 700.)  Dr. Ahn continued Osborne on the same medications.  (*Id*.)

On that same date, Dr. Ahn completed a Mental Functional Capacity Assessment.  (Tr. 704-706.)

He found Osborne was markedly limited in his ability to (1) carry out detailed instructions, (2)

make simple work-related decisions, (3) get along with coworkers or peers without distracting

them or exhibiting behavioral extremes, (4) respond appropriately to changes in the work setting,

and (5) travel in unfamiliar places or use public transportation.  (Tr. 704.)  Dr. Ahn found

Osborne was moderately limited in his ability to (1) remember locations and work-like

procedures, (2) understand and remember detailed instructions, (3) maintain attention and

concentration for extended periods, (4) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances, (5) sustain an ordinary routine without

special supervision, (6) work in coordination with or promixity to others without being distracted

by them, (7) complete a normal workday or work week without interruptions from

psychologically based symptoms and perform at a consistent pace without an unreasonable

number and length of rest periods, (8) interact appropriately with the general public, (9) maintain

socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and (10)

set realistic goals or make plans independently of others.  (*Id*.)

In the summary section of the Assessment, Dr. Ahn stated as follows: "Pt has been

diagnosed with anxiety and mood problems.  Elevated anxiety leads to panic attacks.  He finds it

difficult to be in public places because he is nervous around people and those situations have led

to panic attacks. Flashbacks from abusive childhood."  (Tr. 706.)

Finally, on May 9, 2011, Dr. Ahn completed a questionnaire regarding Osborne's mental

impairments.  (Tr. 711-713.)  He characterized Osborne's mental status as follows:

9

> Pt has a history of significant anxiety disorders that include panic disorder.  He
> avoids leaving his house because being around people exacerbates his anxiety.
> On edge. Worries about his health.  He has a seizure disorder.  Oriented x 3.
> Persistent nightmares. Depression.

(Tr. 712.)  Dr. Ahn further noted Osborne had an impaired memory and was easily frustrated.

(*Id*.)  He found Osborne's "nervousness impairs his focus as his mind wanders and races. Easily

confused at times."  (*Id*.)  Dr. Ahn stated Osborne has very low self-esteem "that makes it

difficult for him to be around people as well."  (*Id*.)  He stated Osborne has "daily episodes and

just being in new and public situations triggers anxiety episodes."  (*Id*.)  He described Osborne's

response to treatment as "limited."  (Tr. 713.)  Finally, Dr. Ahn found Osborne "does not tolerate

change or stress well, noting "[c]hange and stress from various situations increase his anxiety."

(Tr. 713.)

## C.      State Agency Reports

In May 2007, Deborah Koricke, Ph.D., performed a consultative examination of Osborne

and prepared a Disability Assessment Report regarding his mental functioning.  (Tr. 218-222.)

Osborne reported his wife had died of cancer six months previously, and he was currently living

with his mother and step-father.  (Tr. 218.)  He reported he had suffered several head injuries as

a child, explaining his step-father "beat me in the head a lot over seven years."  (Tr. 219.)

Osborne reported a history of grand mal seizures, with his last seizure in October 2006.  (*Id*.)

Osborne also reported "numerous symptoms indicating a depression."  (*Id*.)  He described his

typical mood as "depressed" and reported crying spells and symptoms of panic.  (*Id*.)  Dr.

Koricke noted Osborne was "lonely and isolated" with feelings of helplessness and hopelessness.

(*Id*.)

On examination, Dr. Koricke found Osborne had good appearance and hygiene, normal

10

speech, organized and coherent thought process, and adequate insight and judgment.  (Tr. 219-220.)  She also, however, observed intermittent eye contact, a flat and blunted affect, and a "sluggish, withdrawn and depressed" mood.  (Tr. 220.)  Dr. Koricke noted, in particular, that Osborne had a difficult time maintaining his focus, stating he would "lose his train of thought when speaking at times."  (*Id.*)  She found no indication of any significant learning disorders or intellectual issues, stating he "demonstrated difficulty concentrating and maintaining his focus during the interview, secondary to his depressive disorder rather than an overall cognitive deficit."  (*Id.*)  Dr. Koricke found Osborne "present[ed] as very solemn and despondent with a blunted range of emotion," noting he was "difficult to engage and . . . clearly struggling with depression."  (*Id.*)

Dr. Koricke diagnosed major depressive disorder, recurrent, moderate; and assessed a Global Assessment of Functioning ("GAF") of 45 indicating serious symptoms.[4]  (Tr. 221.)  In the summary section of her report, she found Osborne was "suffering from significant psychological and emotional distress" and "[i]t is highly probable that the stresses and pressures of daily work would exacerbate the acuity of his symptoms, worsening his moderate symptoms to a more severe depression." (*Id.*)

With respect to the four work-related abilities, Dr. Koricke opined that, due to his

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

11

depression, Osborne was moderately impaired in his abilities to: (1) relate to others, including fellow works and supervisors; (2) understand, remember and follow instructions; (3) maintain attention, concentration, persistence and pace to perform simple repetitive tasks; and (4) withstand stress and pressures associated with day-to-day work activity.  (Tr. 221-222.)  In particular, Dr. Koricke noted as follows:

> [Osborne] exhibits difficulty with his attention and concentration, which impairs his ability to respond to questions.  While he is likely functioning within the at least average range of intellectual ability, he struggles to focus and attend which would lead in decreased ability to perform tasks; especially more complicated or detailed tasks.  In sum, he lacks the mental consistency required to adequately and regularly complete work-related tasks.

(Tr. 222.)

A year later, in May 2008, psychologist Thomas E. Zeck, Ph.D., performed a consultative examination of Osborne and prepared a report regarding his mental functioning.  (Tr. 299-305.)  Osborne reported feeling "depressed over 'everything,'" including his health, his finances, and the loss of his wife.  (Tr. 301.)  He endorsed a "terrible sleep pattern," frequent nightmares, crying spells, poor memory, and feelings of helplessness, hopelessness, and worthlessness.  (Tr. 300-301.)  On examination, Dr. Zeck noted Osborne was "quite verbal and participatory, but exhibited a flat affect and seemed to be depressed without a great deal of enthusiasm or animation."  (Tr. 301.)  He did not observe any motor or autonomic signs of anxiety.  (*Id.*)  Dr. Zeck stated Osborne's "mental arithmetic reasoning abilities were within the average range and he was low average in his abstract thinking and logical thinking abilities."  (Tr. 302.)

As part of his evaluation, Dr. Zeck administered the Wechsler Adult Intelligence Scale III.  (*Id.*)  Osborne scored a verbal IQ of 90, a performance IQ of 84, and a full scale IQ of 87.

12

(*Id*.)  In administering this test, Dr. Zeck noted Osborne was "a very slow and deliberate worker and continually second guessed his responses."  (Tr. 303.)  He found Osborne was "quite attentive to the tasks" but his behavior was "somewhat strange and weird."  (*Id*.)  Dr. Zeck also administered the Wechsler Memory Scale III- Abbreviated.  (*Id*.)  Osborne's composite score was 62, which placed him two and a half standard deviations below the mean.  (*Id*.)

Dr. Zeck diagnosed depressive neurosis, not otherwise specified, and assessed a GAF of 52, indicating moderate symptoms.  (Tr. 304.)  With regard to the four work-related mental abilities, Dr. Zeck found as follows:

1. This claimant's mental ability to relate to fellow workers and supervisors appears to be moderately impaired by his depression and his concerns about his physical health and well being.  He related well to this examiner on this interview and testing.  However, it is felt that on a continual basis he may have difficulty because of his emotional state.

2. This claimant's mental ability to understand, remember, and follow instructions appears to be equivocal.  On the one hand he did quite well on the WAIS-III where he had a low average ability and was within the average range on his comprehension abilities.  However on the Wechsler Memory Scale-III he had a memory composite of 62.  On the one hand he did quite well and we did not have to repeat questions to him but on the other hand he had difficulty with memory.  He does report verbally that he has memory problems and always needs to make a list of things that he has to do.  He did put forth a good effort.

3. This claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks may be mildly impaired because of his epilepsy.  He states that he never knows when a seizure is coming on and the seizures are not always controlled.  He did not have problems with the WAIS-III today but did have problems with the Wechsler Memory Scale.  There was an inconsistency in his performance.

4. This claimant's mental ability to withstand the stress and pressures of a day to day work activity are felt to be moderately impaired. It is felt that this is due to not only his epilepsy but also his mental condition of

13

> depression.  There did not appear to be any mental impairment in the
> areas of attention and concentration on the WAIS-III but there seemed
> to be problems on the Wechsler Memory Scale.  Inconsistency makes
> it difficult to determine his ability to perform work.   He himself feels
> that he cannot work because of how he feels on a day to day basis.

(Tr. 304-305.)

In June 2008, state agency psychologist Aracelis Rivera, Psy.D., reviewed Osborne's

records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional

Capacity ("RFC") Assessment.  (Tr. 306-322.)  In the PRT, Dr. Rivera found Osborne suffered

from an affective mood disorder with depressive symptoms including appetite disturbance, sleep

disturbance, decreased energy, and difficulty concentrating and thinking.  (Tr. 313.)  She

concluded Osborne was (1) moderately restricted in his activities of daily living; (2) moderately

restricted in maintaining social functioning; and (3) mildly restricted in maintaining

concentration, persistence, and pace.  (Tr. 320.)

In the Mental RFC Assessment, Dr. Rivera found Osborne was moderately limited in his

abilities to (1) understand, remember, and carry out detailed instructions; (2) interact

appropriately with the general public; (3) ask simple questions or request assistance; (4) accept

instructions and respond appropriately to criticism from supervisors; and (5) respond

appropriately to changes in the work setting.  (Tr. 306-307.)  In all other categories, Osborne was

either "not significantly limited" or there was "no evidence of limitation."  (*Id.*)  In the summary

section of this assessment, Dr. Rivera noted: "The data suggest that the claimant does have some

limitations however significant functional capacity still remains.  Working with the public may

be anxiety provoking but the claimant can interact on a superficial basis.  He can comprehend,

remember, and carry out simple task instructions."  (Tr. 308.)

14

In December 2008, state agency psychologist Todd Finnerty, Psy.D., reviewed Osborne's medical records and affirmed Dr. Rivera's assessment as written.  (Tr.  374.)

**D.      Hearing Testimony**

**1.        September 28, 2010 Hearing Testimony**

During the September 28, 2010 hearing before the previous ALJ, Osborne testified to the following:

- His last full-time job was as a skilled machinist.  (Tr. 37.)  He last performed this job in early 2003, and has not worked since.  (Tr. 38.)

- He stopped working because his "job shut down" and because he started having multiple grand mal seizures.  (Tr. 38.)  He is currently being treated for his seizure disorder by a neurologist.  (*Id*.) He takes medication and avoids triggers such as strobe lights, extreme heat, and sunlight.  (Tr. 38-39.) Over the years, he has been hospitalized many times for his seizures.  (Tr. 39.)  His last seizure was in 2009.  (Tr. 44.)

- He first received mental health treatment in 2006 due to the death of his wife.  (Tr. 40.)  He takes medication, receives counseling from a therapist, and sees a psychiatrist.  (Tr. 41.)

- In 2003, he was abusing alcohol.  (Tr. 41.)  He has maintained his sobriety since July 2008.  (Tr. 47.)  His condition has improved slightly since he became sober.  (Tr. 41.)

- He has a very difficult time concentrating.  (Tr. 42.)  His mind "just runs off on different things," he has a very hard time staying focused, and he feels "confused a lot."  (Tr. 42-43.)  It takes him hours to do a simple task and he feels he is "constantly doing everything wrong."  (*Id*.)  He watches TV at home but finds it very difficult to follow.  (Tr. 45.)  His "brain doesn't work the same" and "can't make sense of things sometimes."  (*Id*.)  His concentration problems began after he first started having seizures.  (Tr. 43.)

- He suffers from anxiety and "feels overwhelmed all the time."  (Tr. 42.)  He stays away from people and "rarely goes out."  (*Id.*)  He gets nervous and has panic attacks.  (*Id.*) He tries to stay alone as much as he can.  (*Id.*)  His moods vary throughout the day.  (Tr. 45-46.)  "Most days are bad" but he has some good days also.  (Tr. 45.)

15

- On a typical day, he mostly stays at home or goes to a friend's house.  (Tr. 42.) He takes walks and exercises at home.  (*Id*.)  He sees his family and friends once in awhile, but has lost interest in a lot of things over the years.  (Tr. 43.)

- In terms of his physical problems, he experiences worsening lower back pain and severe headaches.  (Tr. 48.)  He has had back pain since the 1990's and headaches going back to childhood.  (Tr. 48-49.)  He takes over-the-counter ibuprofen for his back pain and headaches.  (Tr. 50.)

- He is currently taking Tegretol three times per day for his seizures, and Lexapro and Xanax for anxiety and depression.  (Tr. 47.)  At times, he has been unable to afford certain medications.  (Tr. 62-63.)

The VE testified Osborne had past work as a machinist (medium, skilled, SVP 6) and machine shop supervisor, production (light, skilled, SVP 8).  (Tr. 51.)  The ALJ then posed the following hypothetical question:

> [P]lease assume an individual of the same age, education, and work experience as the claimant, however this hypothetical individual would be limited in lifting no more than 50 pounds occasionally, lifting and carrying up to 25 pounds frequently, further limitations would include never climbing ladders, ropes or scaffolding and occasionally climbing ramps or stairs, occasionally balancing – scratch that.  Frequently climbing– the ability to no more than frequently climb ramps and stairs, occasionally balance, frequently stoop, kneel, crouch, and crawl. The individual would avoid concentrated exposure to excessive vibration, avoiding all exposure to unprotected heights, and all exposure to moving machinery.  Finally other limitations would include the limitation that operating a motor vehicle would not be required as part of the job.  Could such an individual – further limitations would include work that's isolated from the public with only occasional interaction with co-workers.  Could such an individual with these limitations perform any of the claimant's past relevant work as actually or generally performed?

(Tr. 52.)

The VE testified the hypothetical individual would not be able to perform his past work as a machinist and machine shop supervisor.  (Tr. 53.)  The VE explained the hypothetical individual would, however, be able to perform other representative jobs in the economy, such as cleaner II (medium, unskilled, SVP 2); linen room attendant (medium, unskilled, SVP 2); and

16

campground attendant (medium, unskilled, SVP 2).  (Tr. 53-54.)

The ALJ then asked a second hypothetical that was the same as the first, but added the limitation that the individual "must be reminded of tasks on an hourly basis."  (Tr. 54.)  The VE testified "if an individual had to be reminded that frequently of the tasks that needed to be done, you'd be talking about a special accommodation, that would not be competitive work."  (*Id.*) The VE also confirmed there would be no jobs for an individual who was off task for 15 or 20 percent of the work day in addition to regularly scheduled breaks.  (Tr. 55.)

Osborne's counsel asked the VE questions regarding the level of concentration and attention and amount of training required for each of the listed jobs, and the VE indicated adequate concentration and attention would be required for all types of employment.  (Tr. 56-62.) The VE also indicated that no more than short demonstrations should be required in order for an individual to learn the positions of campground attendant, linen room attendant, and cleaner II. (Tr. 59-60.)  The VE also stated that, if an individual were to lose consciousness while performing one of the three listed jobs, the potential hazards would be no more dangerous than if an individual lost consciousness while walking and falling on concrete.  (Tr. 56-58.)

**2.    July 23, 2014 Hearing Testimony**

During the July 23, 2014 hearing before the ALJ, Osborne testified to the following:

- He completed the 12th grade but did not graduate.  (Tr. 529.)  The last time he worked was in 2003, when he was employed as a machinist.  (Tr. 518-519.)

- He suffered from anxiety and memory problems as early as 2003.  (Tr. 519-520.) After his wife passed away in October 2006, he suffered from depression and anxiety.  (Tr. 525-526.)  By 2008, he was having daily anxiety and panic attacks, as well as depression and memory problems.  (Tr. 524-525.)  He could not have performed a simple, unskilled job at that time because being around people increased his anxiety and caused him to become panicked.  (Tr. 525.)

17

- He used to have a problem with alcohol addiction.  (Tr. 522.)  The last time he drank was in 2010.  (*Id.*)  After he stopped drinking, his anxiety "did not change whatsoever."  (Tr. 523.)

- He suffers from seizures.  (Tr. 520-523.)  His last grand mal seizure was in April 2014.  (Tr. 520.)  Prior to that date, he experienced seizures two to three times per year since 2006.  (Tr. 521.)  The seizures themselves last several minutes; however, the after effects last for several days.  (Tr. 521-522.)  Immediately after a seizure, he experiences memory problems.  (*Id.*)  He also suffers from "pretty severe" headaches for several days, as well as fatigue.  (*Id.*)

The VE testified Osborne had past work as a machinist.  (Tr. 528.)  The ALJ then posed the following hypothetical question:

> [L]et me present a hypothetical worker to you.  This hypothetical worker is 39 years old * * * [and has a] limited education . . . but training in CNC machining. *** This hypothetical worker has no exertional limitations.  However, he is limited, this hypothetical worker, in that he is precluded from using ladders, ropes, and scaffolds.  He is also precluded from workplace hazards such as unprotected heights and unprotected moving machinery.  He's also precluded from occupational driving.  The hypothetical worker is further limited to simple, routine, low-stress tasks and what I mean by simple, routine, low-stress tasks is this: he is precluded from work in fast-paced production environments; he is limited to no more than superficial interaction with supervisors, coworkers, and the public; and he is precluded from tasks that require arbitr[ation], negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 529-530.)  The VE testified the hypothetical worker could not perform Osborne's past work, but could perform other representative jobs such as landscape laborer (heavy, unskilled, SVP 2), cleaner (medium, unskilled, SVP 2), and dining room attendant (medium, unskilled, SVP 2).  (Tr. 530-531.)

Osborne's counsel then questioned the VE at length.  (Tr. 532-540.)  He first asked the VE the following questions:

> Q:     [P]art of the hypothetical question was simple, repetitive, low-stress tasks, meaning no fast-paced production environment, superficial interaction with all categories of person, no arbitration, negotiation,

18

> confrontation, directing work of others, and responsible for the safety and welfare of others.  Did you consider any other aspects of possible workplace stresses or just the ones that [the ALJ] gave you as the definition that he intended by low-stress tasks?
>
> A:     I answered the question I was asked.  No, I did not.
>
> Q:     Okay.  And your hypothetical here today is based on [the ALJ's] hypothetical question and not any other limitations you may have heard in testimony, isn't that correct?
>
> A:     Yes.

(Tr. 532.)  With regard to pace, the VE testified each of the three identified jobs are "varied pace," meaning "there are times when there is more work that needs to be done and there are times when less work needs to be done."  (Tr. 533.)

Counsel then asked the VE regarding his interpretation of the term "superficial," in terms of  "superficial interactions."  (Tr. 533.)  The VE testified he interpreted this term to mean "cursory, non-intense, the quality of measure of interaction" rather than the quantity of interaction.  (Tr. 533-534.)

Counsel then asked as follows:

> Q:     And if the hypothetical person in hypothetical one had an additional restriction– and, Your Honor, this is from Dr. Koricke's report in 2007– that the individual lacked the mental consistency required to adequately and regularly complete work-related tasks, that hypothetical person could not perform on a competitive basis the occupations you mentioned; correct?
>
> A:     If I understand just from the meaning, yes, I would agree they could not do those jobs.
>
> Q:     And they could not perform other – and that would preclude other unskilled work, correct?
>
> A:     Yes.

Q:      Okay.  And a worker in one of these three occupations or the other occupations to which you more generally alluded would have to be able to perform consistently day after day, correct?

A:      Yes and by consistently I am interpreting that as meets the basic standards of performing the job, that's correct.

Q:      And on these jobs, wouldn't it be fair to say that when the job required it, they would have to be able to concentrate and adequately consistently perform duties, although there might be some downtime between those crucial times in these unskilled jobs; is that correct?

A:      Yes.

(Tr. 536-537.)  Finally, counsel asked the VE "if we add that someone has a moderate, but significant limitation in being able to perform even simple, repetitive tasks, would that person be able to perform the occupations you mentioned or others?"  (Tr. 537.)  The VE testified as follows: "Well, I think that goes back to the discussion of the previous question, is that I think your word consistency, my translation, meeting basic work standards as required for all jobs.  So I think the answer would be no as I previously answered."  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

20

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

21

Here, Osborne was insured on his alleged disability onset date, April 30, 2003, and remained insured through December 31, 2008, his date last insured ("DLI.")  (Tr. 492-493.)  Therefore, in order to be entitled to POD and DIB, Osborne must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

In the September 26, 2014 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since April 30, 2003, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: seizure disorder, major depressive disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant retains the following residual functional capacity. He has no exertional limitations.  He is precluded from using ladders, ropes and scaffolds and from all exposure to workplace hazards such as unprotected heights and moving machinery.  He is precluded from occupational driving. He is limited to simple, routine, low stress tasks.  This means the following. He is precluded from work in fast-paced production environments.  He is limited to superficial interaction with supervisors, coworkers and the public. He is precluded from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565

and 416.965).

7.      The claimant was born on April ** , 1969 and was 34 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.   (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2003 through March 27, 2011. The claimant was previously found disabled beginning March 28, 2011 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 492-503.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

23

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Compliance with Remand Order

Osborne first argues remand is required because the ALJ violated Magistrate Judge Burke's September 2013 Opinion & Order (hereinafter "remand order").  (Doc. No. 13.) Specifically, Osborne maintains "[d]espite the Court's instructions in the remand order, the decision after remand contains no explanation as to how the ALJ accounted in the RFC for the finding of moderate limitations in concentration, persistence, and pace" or, in the alternative, failed to explain "why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary."  (*Id*. at 13.)  Instead, Osborne asserts, "[t]he current decision . . . changed some of the findings underlying the order, making the RFC finding less restrictive, not more."  (*Id*.)  In particular, Osborne objects that (1) the "new" RFC deleted the word "repetitive" from the prior RFC finding, (2) changed "occasional" interaction with

coworkers to "superficial" interactions, and (3) "added meaningless prohibitions on higher-level interactions such as arbitration, negotiation, confrontation, directing the work of others, and being responsible for the safety of others (which do not further limit 'simple, routine' work)." (*Id.*)

The Commissioner argues that "after the Appeals Council vacated the ALJ's prior decision, the ALJ properly considered the issues *de novo* and issued a new decision."  (Doc. No. 15 at 15.)  She asserts the ALJ adequately addressed Magistrate Judge Burke's concerns regarding Osborne's concentration, persistence, and pace by limiting him to simple, routine, low-stress tasks that precluded work in fast-paced work environments.  (*Id.*)  She states that "[w]hile the ALJ could have stated his finding with more detail, . . . the record evidence as a whole supports the ALJ's RFC finding."  (*Id.*)

The Sixth Circuit has held that, where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceedings, "it is the duty of . . . the agency from which appeal is taken . . . to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions." *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967).  As that Court later explained:

> In some Social Security cases, district courts will include detailed instructions concerning the scope of the remand and the issues to be addressed.  In such cases, "[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).  *See also Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967) . . . These cases stand for the proposition that the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order.

*Hollins v. Massanari*, 2002 WL 31398968 at * 2 (6th Cir. Oct. 17, 2002).

That being said, the Sixth Circuit noted in *Hollins* that "[t]hese cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion." *Id.* Indeed, courts have found that "as long as an issue was not finally decided in the District Courts, the ALJ can exceed the scope of a remand order and reconsider any evidence deemed appropriate in reaching a decision regarding a claim." *Beatty v. Comm'r of Soc. Sec.*, 2015 WL 5693663 at * 3 (E.D. Mich. Sept. 29, 2015). *See also Drossman v. Comm'r of Soc. Sec.*, 2008 WL 1848202 at * 6 (N.D. Ohio April 17, 2008) (finding that "*Hollins* explicitly allowed ALJs receiving a case on remand to move beyond the issues examined in the district court opinion" and "ALJs should not feel constrained to only consider the limited issues previously presented and specifically remanded for further consideration."); *Killings v. Colvin*, 2016 WL 2868699 at * 12-13 (N.D. Ohio May 17, 2016) (same).

Here, the previous ALJ found Osborne had moderate limitations in concentration, persistence, and pace, and limited him to "simple, routine, and repetitive tasks, with only occasional supervision, occasional interaction with co-workers, and isolation from the public." (Tr. 19, 20, 22.)  On appeal to this Court, Magistrate Judge Burke held as follows:

> With respect to whether the ALJ adequately accounted in the RFC for his findings that Osborne had moderate limitations in concentration, persistence and pace, the Court notes that, here, the ALJ did discuss at length the various medical opinions relating to Osborne's ability to maintain concentration, persistence and pace.  Tr. 19, 22.  Also, the ALJ explained that the RFC accounted for Osborne's difficulties with respect to focusing and concentrating by requiring occasional supervision.  Tr. 22.  Missing from the ALJ's reasoning, however, is an explanation as to how the ALJ accounted in the RFC for moderate limitations in pace and persistence, not just concentration.
>
> In *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516–17 (6th Cir. 2010) the ALJ found that the claimant had moderate difficulties in concentration, persistence and pace but the ALJ did not ask the vocational expert a hypothetical containing a fair summary of those restrictions.  *Id.* at 516.  Instead, the ALJ's hypothetical

only limited the claimant to simple, repetitive tasks and instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination. *Id.*

Although *Ealy* may not establish a bright-line rule as to how an ALJ must accommodate moderate limitations in concentration, persistence or pace, it is instructive.  **Without more explanation in the ALJ's decision, it is unclear how a limitation of occasional supervision fairly described Osborne's limitations in concentration, persistence and pace.  Thus, on remand, the ALJ should provide further explanation as to how he accounted in the RFC for his findings of moderate limitations in concentration, persistence and pace, or alternatively, explain why additional restrictions beyond simple, routine, and repetitive tasks and occasional supervision were not necessary.** *See Ealy*, 594 F.3d at 516–517 (citing *Edwards v. Barnhart*, 383 F. Supp.2d 920, 930–31 (E.D. Mich.2005) for the propositions that "hypothetical limiting claimant to 'jobs entailing no more than simple, routine, unskilled work' not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace" and " 'Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.' ").

*Osborne,* 2013 WL 5221107 at * 14 (footnotes omitted) (emphasis added).

After the Appeals Council vacated the October 2010 decision,[5] an ALJ conducted a hearing, considered the evidence (including additional evidence post-dating the October 2010 ALJ decision), and issued a decision finding Osborne was not disabled from April 2003 through March 27, 2011.  (Tr. 492-502.)  At the beginning of the decision, the ALJ recounted the above procedural history and expressly stated as follows:

---

[5] As noted *supra*, prior to the issuance of Judge Burke's decision, on March 28, 2011, Osborne filed another application for SSI.  (Tr. 567.)  On January 4, 2013, a different ALJ issued a favorable written decision finding Osborne was disabled as of the date of his application.  (Tr. 567-576.)   The Appeals Council affirmed the ALJ's favorable decision but determined the period prior to March 28, 2011 required further administrative proceedings.  (Tr. 492, 605.)  The Appeals Council therefore vacated the October 2010 ALJ decision and remanded it for further proceedings consistent with Magistrate Judge Burke's Opinion & Order.  (Tr. 492, 605.)

> Pursuant to the District Court remand order, the Appeals Council has directed the undersigned to: (1) give further consideration to the claimant's maximum residual functional capacity during the period at issue and provide rationale with specific references to evidence of record in support of assessed limitations, specifically, the claimant's moderate limitations to concentration, persistence, and pace; and (2) obtain vocational expert testimony based on a hypothetical question or questions that completely and accurately describe the claimant's residual functional capacity.

(Tr. 492.)

At step two, the ALJ determined Osborne suffered from the severe impairments of seizure disorder, major depressive disorder, and generalized anxiety disorder.  (Tr. 495.)  He then determined, at step three, that Osborne's impairments, considered singly or in combination, did not meet or equal a listing.  Of particular relevance, at this step, the ALJ found (for the period April 2003 through March 27, 2011) Osborne had moderate difficulties in concentration, persistence, or pace:

> With regard to concentration, persistence, or pace, the claimant has moderate difficulties.  At the consultative psychological examination performed by Dr. Koricke on May 8, 2007, she concluded that the claimant was moderately impaired in his ability to maintain attention, concentration, persistence, and pace, moderately impaired in his ability to understand, remember, and follow instructions, and moderately impaired in his ability to withstand the stress and pressure associated with day to day work activity (Exhibit 3F, pp. 6-7).  At the consultative psychological examination performed by Dr. Zeck on May 29, 2008, he concluded that the claimant was mildly impaired in his ability to maintain attention, concentration, persistence, and pace to perform simple tasks but that his ability to withstand the stress and pressure of day to day work activities was moderately impaired.  He also noted that the claimant had memory problems (Exhibit 11F, p. 7).  In a medical source statement completed by the claimant's treating psychiatrist, Dr. Ahn, dated March 28, 2011, he also concluded that the claimant was moderately limited in his ability to maintain attention and concentration (Exhibit 37F, p. 1).  His treatment notes also indicate that the claimant does not have impaired cognitive function (Exhibit 26F, p. 5).

(Tr. 497.)

29

At step four, the ALJ discussed the medical evidence regarding Osborne's mental impairments, including treatment records indicating depressed and anxious mood, difficulty focusing, tearfulness, feelings of hopelessness and helplessness, poor sleep and appetite, and poor self-esteem and self-confidence. (Tr. 498-499.) However, the ALJ also noted several GAF scores indicating moderate symptoms, including a GAF of 52 in May 2008 and a GAF of 60 in August 2009. (Tr. 499.) The ALJ further found "[t]he evidence establishes that the claimant's treatment has included counseling and medication including Xanax and Lexapro" and "[r]ecords from both Dr. Ahn and Mr. Williams indicate that the claimant was doing well on medication." (*Id*.)

As discussed at greater length *infra*, the ALJ then considered the opinion evidence, assigning "great weight" to Dr. Zeck's assessment, "some weight" to Dr. Koricke's assessment, "some weight" to the opinions of state agency physicians Drs. Rivera and Finnerty, and "less weight" to the April 2010 and August 2010 opinions of Dr Ahn. (Tr. 499-500.) The ALJ formulated the following RFC:

> The claimant retains the following residual functional capacity. He has no exertional limitations. He is precluded from using ladders, ropes and scaffolds and from all exposure to workplace hazards such as unprotected heights and moving machinery. He is precluded from occupational driving. **He is limited to simple, routine, low stress tasks. This means the following. He is precluded from work in fast-paced production environments. He is limited to superficial interaction with supervisors, coworkers, and the public. He is precluded from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.**

(Tr. 498) (emphasis added).

The ALJ did not violate the Court's remand order. As required by that order, the ALJ addressed Osborne's moderate limitations in concentration, persistence and pace. The decision

acknowledged treatment records regarding Osborne's problems with focus and concentration, but also emphasized that both Dr. Koricke and Dr. Zeck opined Osborne was, at most, moderately limited in concentration, persistence, and pace.  The ALJ then accounted for these limitations by restricting Osborne to simple, routine, low-stress work involving no fast-paced production environments; superficial interaction with supervisors, coworkers, and the public; and no work involving arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.  *See Dultmeyer v. Comm'r of Soc. Sec*., 2014 WL 991900 at * 18 (N.D. Ohio March 13, 2014) ("The RFC limits [the claimant] to simple, routine work which adequately addresses the issue of concentration"); *Kline v. Comm'r of Soc. Sec*., 2013 WL 1947164 at * 5 (N.D. Ohio April 17, 2013) (explaining that the claimant's limitations in concentration and persistence were satisfied when the RFC limited her to "simple, routine, repetitive, one or two step tasks"); *Foreman v. Colvin*, 2013 WL 3200615 at * 13 (N.D. Ohio June 24, 2013) (finding the hypothetical question accounted for [the claimant's] moderate limitations in concentration, persistence, and pace by limiting her to 'simple and routine tasks, but not in a fast-paced production environment.")

Osborne argues the ALJ violated the remand order because he changed several of the restrictions in the previous RFC.  This argument is without merit.  The ALJ was not bound, on remand, to adopt an RFC containing identical terms to the previous RFC.  Magistrate Judge Burke's Opinion did not require such a result.  Rather, Magistrate Judge Burke found the previous ALJ failed to adequately explain how the RFC accounted for Osborne's moderate limitations in concentration, persistence, *and* pace, and ordered the ALJ to address this deficiency on remand.  The ALJ conducted a new hearing on remand and considered both the

31

evidence that had been before the previous ALJ as well as evidence post-dating the previous

decision.  In fashioning the RFC currently at issue, the ALJ properly based his decision on the

entirety of the record before him, which included this new testimony and medical evidence.

Under these circumstances, it was not a violation of the Court's remand order for the ALJ to

fashion an RFC containing somewhat different restrictions regarding concentration, persistence,

and pace.  *See Beatty,* 2015 WL 5693663 at * 3 (finding "as long as an issue was not finally

decided in the District Courts, the ALJ can exceed the scope of a remand order and reconsider

any evidence deemed appropriate in reaching a decision regarding a claim."); *Killings*, 2016

WL 2868699 at * 12-13.  *See also* 20 CFR § 404.983 (upon remand by a federal court, "[a]ny

issues relating to your claim may be considered by the [ALJ] whether or not they were raised in

the administrative proceedings leading up to the final decision in your case.")

  Moreover, while the ALJ could have provided a more detailed explanation of the basis

for his RFC findings, the Court finds the ALJ sufficiently articulated his reasoning.  As noted

above, the ALJ acknowledged hearing testimony and medical evidence regarding Osborne's

limitations in concentration, persistence, and pace, but determined Osborne was only

moderately restricted in this regard in light of treatment records indicating he was doing well on

his medication and opinion evidence finding moderate limitations.  The RFC fully

accommodated Osborne's limitations in concentration, persistence, and pace by expressly

limiting him to simple, routine, low stress work; no fast-paced production environments;

superficial interaction with supervisors, coworkers, and the public; and no arbitration,

negotiation, confrontation, directing the work of others, or being responsible for the safety of

others.  *See e.g.,  Dultmeyer*, 2014 WL 991900 at * 18; *Kline,* 2013 WL 1947164 at * 5;

*Foreman,* 2013 WL 3200615 at * 13; *Thompson v. Comm'r of Soc. Sec.*, 2014 WL 356974

(N.D. Ohio Jan. 31, 2014) ("At least this Court has found that a hypothetical to the VE limiting

the claimant to no quotas or production line work adequately accounted for moderate limitations

in concentration, persistence, or pace." ).

      While the January 4, 2013 favorable ALJ decision found greater limitations for the

period after March 28, 2011, Osborne has not shown the ALJ's determination for the period

prior to that date is not supported by substantial evidence.  Treatment records dated prior to

March 28, 2011 show that, although Osborne continued to experience some depression and

anxiety, medication improved his symptoms.  *See* Tr. 464 ("He reported that he has noticed

some improvement in his anxiety, as well as being able to sleep better"); Tr. 703 (" His mood is

okay and his anxiety has improved [since taking Xanax three times day], but he still has some

remnants of his anxiety") Tr. 702 ("The patient has had increasing anxiety and depression

during the holidays, but is feeling better now that it is over. . . He still has some anxiety

symptoms and panic-like symptoms [but] [h]is medication appears to working okay for him.");

and Tr. 700 ("Patient claims the Klonopin has helped him with having fewer nightmares.")

Additionally, Mr. Williams' records show improvement over time.  For example, in June 2010,

Osborne represented to Mr. Williams that he was doing better and his anxiety levels were down.

(Tr. 474.)  In August 2010, Mr. Williams noted Osborne had had a good couple of weeks and

spent a week at his girlfriend's family's house in West Virginia.  (Tr. 471.)

      Finally, as the ALJ noted, the opinion provides support for the RFC's mental

limitations.  Dr. Koricke found Osborne was moderately impaired in his ability to maintain

attention, concentration, persistence and pace to perform simple repetitive tasks.  (Tr. 221-222.)

Dr. Zeck found Osborne was moderately limited in his ability to relate to fellow workers and supervisors, and withstand the stress and pressures of day to day work activity; and only mildly limited in his ability maintain concentration, persistence, and pace.  (Tr. 304-305.)  Neither of these consultative examiners opined Osborne required specific restrictions greater than that set forth in the RFC in order to accommodate his moderate limitations in concentration, persistence, and pace.  Although Dr. Ahn opined greater impairment in this regard, the Court finds (as set forth in greater detail *infra*), the ALJ properly discounted Dr. Ahn's opinions.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not violate Magistrate Judge Burke's Opinion & Order.  Osborne's first assignment of error is without merit.

### Opinion Evidence

Osborne argues the ALJ failed to properly weigh the opinions of Drs. Ahn, Koricke, and Zeck.  (Doc. No. 13.)  The Commissioner asserts the ALJ articulated "good reasons" for rejecting Dr. Ahn's opinions of marked impairment and properly analyzed both Dr. Koricke's and Dr. Zeck's assessments.  (Doc. No. 15.)

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. §

404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

_____

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

"On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other

---

source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

In this regard, it bears noting that, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified," ALJs must consider their findings and opinions.  *See* 20 CFR § 404.1527(e)(2)(i).  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

### Dr. Ahn

Osborne first argues the ALJ erred in evaluating Dr. Ahn's August 20, 2010 opinion because "no clear finding was made about whether Dr. Ahn was a 'treating source'" and "the decision does not show that the ALJ realized Dr. Ahn had seen Osborne four times before the August report."  (Doc. No. 13 at 18-19.)  He asserts "mis-categorizing a treating source as a non-treating source by undercounting the treating sessions is reversible error, and shows that the ALJ did not consider the entire record."  (*Id.* at 19.)  Osborne further argues the ALJ's conclusion that he was doing well on his medication is inaccurate.  (*Id.* at 20.)

The Commissioner asserts the ALJ articulated good reasons for rejecting Dr. Ahn's

opinions of marked impairment, including GAF scores indicating moderate symptoms,

treatment records showing improvement with medication, and the opinions of Drs. Koricke and

Zeck finding (at most) moderate impairment in Osborne's mental work-related abilities.  (Doc.

No. 15 at 10-11.)

At step four, the ALJ discussed the medical evidence regarding Osborne's mental

impairments as follows:

> As noted above, the claimant also suffers from depression and anxiety.
> Records from Dr. Ahn note that the claimant has depressed and anxious
> mood, he cannot focus, has tearfulness, feelings of hopelessness and
> helplessness, and poor sleep and appetite (Exh. 30F, p. 2).  He also has poor
> self-esteem and self-confidence (Exhibit 27F, p. 12.).  Nevertheless, Dr. Ahn
> indicated in June and August 2010 that the claimant's global assessment of
> functioning score (GAF) over the last year was 60, which indicates moderate
> symptoms (Exhibits 25F; 26F, p. 6).  The assessment completed by Diana
> Adams, LSW at the Nord Center dated August 25, 2009 also noted a GAF of
> 60 (Exhibit 23F, p. 11).  Dr. Zeck assigned the claimant a GAF of 52 at the
> consultative exam that he performed on May 29, 2008, which also indicates
> moderate symptoms (Exhibit 11F).  The evidence establishes that the
> claimant's treatment has included counseling and medication including Xanax
> and Lexapro (Exhibit 26F).  Records from both Dr. Ahn and Mr. Williams
> indicate that the claimant was doing well on his medication (Exhibits 26F, p.
> 2; 27F, p. 4; 36F, pp. 3-4).

(Tr. 498-499.)  The ALJ then weighed Dr. Ahn's August 2010 opinion as follows:

> Less weight is given to the questionnaire completed by the claimant's treating
> psychiatrist, Dr. Ahn, dated August 20, 2010 that found that the claimant has
> marked limitations in his ability to maintain attention and concentration,
> perform work activities at a reasonable pace, keep a regular work schedule and
> maintain punctual attendance, interact appropriately with others, and make
> judgments that commensurate with the functions of unskilled work because this
> questionnaire was completed only a few months after Dr. Ahn started treating
> the claimant and he had not yet established a relationship with him.  These
> findings are also not supported by Dr. Ahn's subsequent treatment notes which
> establish that the claimant was doing well on his medication (Exhibit 25F).

(Tr. 500.)

38

The Court rejects Osborne's argument that remand is required because it is unclear whether the ALJ categorized Dr. Ahn as a treating source.  The ALJ discussed Dr. Ahn's treatment notes and expressly identified him as Osborne's treating psychiatrist.  (Tr. 498-499, 500.)  The decision also makes clear the ALJ was aware Dr. Ahn had seen Osborne on four occasions prior to completing his August 2010 opinion.  These four sessions occurred on April 12, June 25, July 19, and August 16, 2010, and are identified in the administrative record as Exhibits 26F and 30F.  (Tr. 670-671, 464-468.)  In the decision, the ALJ expressly references Dr. Ahn's treatment notes located at Exhibits 26F and 30F, which refutes Osborne's argument the ALJ was not aware of Osborne's treatment history with Dr. Ahn.  Thus, the Court rejects Osborne's argument the ALJ mis-categorized Dr. Ahn as a non-treating source or "overlooked some of Dr. Ahn's treatment sessions."

The Court also finds it was not error for the ALJ to accord less weight to Dr. Ahn's August 2010 report because "this questionnaire was completed only a few months after Dr. Ahn started treating the claimant and he had not yet established a relationship with him."  (Tr. 500.)  The length of the treatment relationship, frequency of examination, and nature and extent of treatment are factors the ALJ could consider in determining how much weight to afford Dr. Ahn's opinions.  *See* 20 CFR § 404.1527(c)(2)(i) and (ii).[7]  Thus, it was not inappropriate for the ALJ to cite (as one factor in his decision to discount Dr. Ahn's August 2010 opinion) the

_____

[7] *See* 20 CFR 404.1527(c)(i) (providing that "[g]enerally the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); 404.1527(c)(ii)(stating that "[g]enerally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed . . ." )

39

fact that Osborne had only treated with Dr. Ahn for four months at the time the opinion was

rendered.  Moreover, while inartful, the ALJ's statement that Dr. Ahn had "not yet established a

relationship" with Osborne is reasonably construed to address the extent of Osborne's treatment

with Dr. Ahn, rather than an indication that the ALJ miscategorized Dr. Ahn as a non-treating

source.  In other words, the Court interprets the ALJ's statement as emphasizing that, although

Dr. Ahn qualified as "treating source" as a matter of law, Dr. Ahn had only seen Osborne four

times at the time he rendered his August 2010 opinion and, therefore, had not yet formed a

long-term relationship with him.

In any event, as the Commissioner correctly notes, the nature and extent of the

treatment relationship is not the only reason the ALJ provided for rejecting Dr. Ahn's August

2010 opinion.  The ALJ also rejected this opinion on the grounds it was "not supported by Dr.

Ahn's subsequent treatment notes which establish that the claimant was doing well on his

medication."  (Tr. 500.)  As discussed *supra*, this reason is supported by substantial evidence in

the record.  *See* Tr. 464 (8/16/10) ("He reported that he has noticed some improvement in his

anxiety, as well as being able to sleep better"); Tr. 703 (10/11/10) (" His mood is okay and his

anxiety has improved [since taking Xanax three times day], but he still has some remnants of

his anxiety") Tr. 702 (1/7/11)("The patient has had increasing anxiety and depression during the

holidays, but is feeling better now that it is over. . . He still has some anxiety symptoms and

panic-like symptoms [but] [h]is medication appears to working okay for him."); and Tr. 700

(3/28/11) ("Patient claims the Klonopin has helped him with having fewer nightmares.")

Based on the above, the Court finds the ALJ articulated "good reasons" for rejecting

Dr. Ahn's August 2010 opinion and, further, that those reasons are supported by substantial

evidence in the record.

Dr. Ahn also offered an opinion regarding Osborne's mental functioning in April 2010.

(Tr.  670-671.)  The ALJ rejected this opinion as follows:

> Similarly, less weight is given to the mental capacity assessment completed
> by Dr. Ahn on April 12, 2010, which noted mostly marked limitations because
> this was also completed around the time that Dr. Ahn began treatment with
> the claimant and is inconsistent with subsequent treatment notes (Exhibit
> 30F).

(Tr. 500.)  Osborne concedes that "on this record Dr. Ahn was not a 'treating source' on April

12, 2010, within the meaning of the evidence-weighing regulations"  (Doc. No. 13 at 17.)  He

argues, however, "this report should have been weighed as a one-time examination report from

an acceptable medical source, although it should have been given more weight than a one-time

examination because it relief in part on a recent previous examination by Thomas Williams,

M.A., LPCC, a clinical counselor supervised by Dr. Ahn."  (*Id.*)

The Court finds the ALJ properly discounted Dr. Ahn's April 12, 2010 opinion.

Because Dr. Ahn was not a treating source at the time he offered this opinion, the ALJ was not

required to articulate "good reasons" for discounting it.  Nonetheless, the ALJ provided a good

reason for rejecting this opinion by stating it was "inconsistent with subsequent treatment

notes."  (Tr. 500.)  Reading the decision as a whole, and as set forth above, substantial evidence

in the record supports the ALJ"s conclusion that Dr. Ahn's assessment of marked limitations

was inconsistent with later treatment notes showing improvement with medication and

treatment.

Lastly, Dr. Ahn offered an opinion on March 28, 2011 regarding Osborne's mental

functioning.  (Tr. 704-706.)  The ALJ accorded no weight to this opinion because it was

41

"completed after the claimant was already found disabled."  (Tr. 500.) Osborne argues the ALJ

erred in discounting Dr. Ahn's opinion on this basis because it "sheds light on the period before

the examination that day; the report was issued on the same day that Plaintiff filed a subsequent

SSI application and was found disabled."  (*Id*. at 17.)

The Court rejects this argument.  While the ALJ discounted this opinion, it is clear he

did consider it in his evaluation of Osborne's mental functioning.  Indeed, the ALJ expressly

references this opinion at step three in finding Osborne had moderate limitations in

concentration, persistence, and pace.  In any event, the reason provided by the ALJ for rejecting

Dr. Ahn's August 2010 opinion (i.e., that it was inconsistent with subsequent treatment notes)

applies equally to Dr. Ahn's March 28, 2011 opinion.  Accordingly, even if the ALJ did err, any

such error was harmless.

Accordingly, the Court finds the ALJ properly evaluated Dr. Ahn's opinions regarding

Osborne's mental limitations.[8]  This assignment of error is without merit.

### Drs. Koricke and Zeck

Osborne next argues remand is required because, although the ALJ addressed Dr.

Koricke's May 2007 opinion, the decision failed to specifically discuss her finding that "it is

highly probable that the stresses and pressures of daily work would exacerbate the acuity of

[Osborne's] symptoms, worsening his moderate symptoms to a more severe major depression."

---

[8]  Dr. Ahn also offered an opinion on May 9, 2011 regarding Osborne's mental
functioning.  (Tr. 711-713.)  The ALJ accorded " no weight" to this opinion because it
was "completed after the claimant was already found disabled."  (Tr. 500.) Osborne
concedes the May 2011 report "is not as relevant, as it was issued more than one month
after the subsequent ALJ found disability."  (Doc. No. 13 at 18.)

42

(Doc. No. 13 at 21.)  He further asserts the ALJ erred in failing to explicitly address Dr. Zeck's opinion Osborne was moderately impaired in relating to fellow workers and supervisors but "on a continual basis he may have difficulty because of his emotional state."  (*Id*. at 22.)  Osborne argues both of these opinions are more restrictive than the RFC and, therefore, the ALJ should have explained why they were not adopted.

The Commissioner argues the ALJ properly accounted for Dr. Zeck's opinion by limiting Osborne to "superficial" interactions and precluding him from tasks requiring arbitration, negotiations, confrontation, directing the work of others, and being responsible for the safety of others.  (Doc. No. 15 at 13.)  She further asserts the ALJ properly evaluated Dr. Koricke's opinion, noting the ALJ only gave "some weight" to this opinion and rejected Dr. Koricke's assessment of serious symptoms.  (*Id*.)

The ALJ addressed the opinions of Drs. Zeck and Koricke as follows:

Great weight is given to the opinion of Dr. Zeck who performed the consultative psychological examination on May 29, 2008.  He assigned the claimant a GAF of 52, which indicates moderate symptoms and this is consistent with the overall evidence in the record.  He also found that the claimant was mildly limited in his ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks and moderately limited in his ability to understand, remember, and carry out instructions, relate to fellow workers and supervisors, and withstand the stresses and pressures of day to day work activity because this is supported by the overall evidence in the record (Exhibit 11F).

* * *

Some weight is given to the opinion of Dr. Koricke who performed the consultative psychological examination on May 8, 2007.  She opined that the claimant was moderately limited in his ability to relate to others, understand, remember and follow instructions, maintain attention and concentration, and withstand the stress and pressures associated with day to day work activity, because these findings are supported by evidence in the record.  However, she assigned the claimant a GAF of 45, which indicates serious symptoms, and as

43

> noted above, the evidence in the record, including her own findings at the
> exam, consistently shows that the claimant has moderate symptoms due to his
> mental impairments (Exhibit 3F).

(Tr.  499-500.)

The ALJ properly evaluated the opinions of Drs. Zeck and Koricke.  As noted previously, opinions from non-treating sources (such as Drs. Koricke and Zeck) are not assessed for "controlling weight" and an ALJ is not required to provide "good reasons" for discounting all or part of a non-treating source opinion.  *See Gayheart*, 710 F.3d at 376 ("On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight'"); *Adams v. Colvin*, 2015 WL 4661512 at * 21 (N.D. Ohio Aug. 5, 2015) ("Dr. House was not Adams' treating physician and, therefore, the ALJ was not required to satisfy the 'good reasons' requirement in rejecting his opinion."); *Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("[T]he procedural 'good reasons' requirement does not apply to non-treating physicians.")  Rather, all that is required is that an ALJ consider the findings and opinions of state agency non-treating sources and explain in the decision the weight given to such opinions, unless a treating physician's opinion has been accorded controlling weight.  20 CFR § 404.1527(e)(2)(ii).

The Court finds the ALJ did not err in his analysis of Dr. Zeck's May 2008 opinion. The decision acknowledged Dr. Zeck's opinion of moderate impairment and accorded it "great weight" on the grounds it was "consistent with the overall evidence in the record."  (Tr. 499.) As discussed *supra*, this finding is supported by substantial evidence in the record, including treatment notes of Dr. Ahn and Mr. Williams showing gradual improvement with medication and therapy.  Although the ALJ did not expressly discuss Dr. Zeck's rather equivocal statement

that "on a continual basis [Osborne] may have difficulty because of his emotional state," he was not required to do so.  *See Devins v. Astrue*, 2012 WL 220246 at * 11 (S.D. Ohio Jan. 25, 2012) ("There is no requirement that the ALJ adopt the precise language offered by a medical source, as long as the ALJ's conclusion is supported by substantial evidence.")  Dr. Zeck did not opine any specific limitations that are clearly more restrictive than the mental limitations set forth in the RFC.  The analysis provided by the ALJ regarding Dr. Zeck's evaluation satisfies the explanation requirement for non-treating, examining psychologists and is supported by substantial evidence.

The ALJ also did not err in his evaluation of Dr.  Koricke's May 2007 opinion.  The ALJ acknowledged this opinion, but accorded it only "some weight" on the grounds Dr. Koricke's assessment of moderate limitations was inconsistent with (1) her finding that Osborne had a GAF of 45, indicating serious symptoms, and (2) "the evidence in the record. . . consistently shows that the claimant has moderate impairments due to his symptoms."  (Tr. 499-500.)  This analysis satisfies the explanation requirement for non-treating, examining psychologists and is supported by substantial evidence.  Moreover, although the ALJ did not specifically note Dr. Koricke's opinion that "it is highly probable that the stresses and pressures of daily work would exacerbate the acuity of [Osborne's] symptoms, worsening his moderate symptoms to a more severe major depression," the analysis provided articulates a sufficient basis for rejecting this finding.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in his evaluation and analysis of the opinions of consultative examiners Drs. Zeck and Koricke.

This assignment of error is without merit.[9]

### *Drummond*

In his final assignment of error, Osborne argues the ALJ erroneously failed to harmonize the instant decision finding him not disabled prior to March 28, 2011, with the favorable January 4, 2013 ALJ decision finding him disabled as of March 28, 2011.  (Doc. No. 13 at 23.)  Specifically, Osborne maintains "[t]he principles of 42 USC § 405(h), as interpreted in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), prevent finding non-disability for an earlier period of time when an ALJ has already finally decided that the claimant was disabled for a later period, and there was no change of circumstances between the time periods."  (*Id.*)  He asserts that "[t]o harmonize the two decisions without undermining the finality of [the fully favorable] ALJ decision, [the instant ALJ] was required to make an evidence-based finding about when, within the period he was adjudicating, claimant's RFC became the RFC" that existed on March 28, 2011.  (*Id.* at 25.)

The Commissioner argues *Drummond* applies only when an ALJ is considering a subsequent disability claim with an unadjudicated period arising under the same title of the Act as a prior claim.  (Doc. No. 15 at 16.)  She maintains *Drummond* is distinguishable because the ALJ in this case was considering a prior claim remanded and vacated, not a subsequent claim.

---

[9] Osborne argues, summarily, that "the decision also errs in its implicit theory that 'moderate' difficulties show non-disability because they do not significantly impinge upon simple unskilled work." (Doc. No. 13 at 22.) He asserts that, by definition, "moderate mental difficulties significantly limit basic mental work activities such as responding appropriately to supervision and coworkers."  (*Id*. at 23.)  Osborne cites no case law in support of this proposition, and the Court rejects it.  As discussed at length, the RFC accommodated Osborne's moderate limitations in concentration, persistence and pace, and is supported by substantial evidence in the record.

(*Id.*)  The Commissioner asserts "the ALJ did not commit reversible error by not finding an RFC consistent with [the other ALJ's] RFC finding because the two ALJs were considering two different time periods."  (*Id.*)

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d at 842.  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at 839.  After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition.  *Id*. at 841-842.

Osborne's argument that the reasoning of *Drummond* applies to the instant case is without merit.  Indeed, the Sixth Circuit considered and rejected this argument in *Asbury v. Comm'r of Soc. Sec*., 83 Fed. Appx. 682 (6th Cir. 2003).  In *Asbury*, the plaintiff applied for, and was denied social security disability insurance benefits for the period ending May 23, 1995.  *Id*. at 682.  The plaintiff then filed a second application for benefits, and the Social Security Administration ("SSA") granted her benefits beginning on May 24, 1995.  *Id*.  The plaintiff appealed the denial of her first application, asserting the ALJ erred by not applying principles of administrative *res judicata* to bind the Commissioner with respect to the disability finding under

47

her second application.  *Id.*

The Sixth Circuit rejected this argument, finding "Asbury seeks in effect to bootstrap her success on the second application so as to require the Commissioner to find disability for the earlier period unless the agency can demonstrate a change in her condition."  *Id.*  The court noted that "[i]t would be an artificial exaltation of form over substance to turn the requirement that the Administration cannot reconsider facts underlying the later period into a requirement that the same facts must be accepted for earlier periods as to which the binding administrative decision does not apply."  *Id.*  Thus, the Sixth Circuit concluded the SSA was not required to make an affirmative showing of changed circumstances prior to May 24, 1995.  *Id.* at 682–83.

In so holding, the Sixth Circuit explained that *Drummond* was distinguishable:

> This analysis is not at odds with *Drummond,* which is distinguishable.  In *Drummond,* we held that an ALJ's factual determination that the claimant retained the residual functional capacity for sedentary work, made in connection with an ultimate finding that the claimant was not disabled, was controlling with regard to an ALJ's subsequent determination of residual functional capacity for a later period, absent a showing of changed circumstances by the Commissioner.  *See Drummond*, 126 F.3d at 838–39, 842. . . . The holding in *Drummond* reflects "the reality that the mere passage of time often has a deleterious effect on a claimant's physical or mental condition," *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir.1999), and that as a result of this deterioration, people who become disabled often never recover from their disability.  The same may not be said where, as here, the claimant argues that the finding of disability is controlling with regard to whether she was disabled during a prior period.  A claimant must have enough social security earnings to be eligible for social security disability insurance, *see* 20 C.F.R. § 404.315, meaning that at sometime prior to the claimant's disability, the claimant was able to engage in substantial gainful activity, and was not, therefore, disabled, *see* 20 C.F.R. § 404.1505.  Thus, the practical considerations that undergird giving controlling effect to the determination in *Drummond* are not present in *Asbury*'s case.

*Id.* at fn. 2.

In light of the above, the Court rejects Osborne's argument that the favorable January

48

2013 ALJ decision prevented the instant ALJ from finding disability prior to March 28, 2011 absent a demonstration of change in circumstances.  The Court also rejects Osborne's argument that the instant ALJ was required to "make an evidence-based finding about when, within the period he was adjudicating, Osborne's RFC became the RFC" that existed on March 28, 2011. Osborne cites no authority for this proposition and offers no persuasive argument as to why the ALJ should be required to make such a finding.[10]  The ALJ was required to determine whether Osborne had established disability during the time period between his onset date of April 2003 and March 27, 2011.  As discussed at length above, the ALJ fully considered the testimony, medical evidence, and opinion evidence from this time period and concluded Osborne failed to carry his burden.  This finding is supported by substantial evidence and Osborne's argument is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

/s Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 20, 2016

---

[10] The Court further notes that, in the favorable January 2013 decision, the ALJ expressly notes that: "The claimant has submitted new evidence in connection with the current application.  This evidence does not establish a change in his condition regarding the period adjudicated by [the previous ALJ]; i.e., April 30, 2003 through October 13, 2010. However, the evidence submitted related to the claimant's condition and functioning since the date of the current application, March 28, 2011, does establish a change in his condition in several respects."  (Tr. 568.)

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).